## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

     Plaintiff,

     v.                             Case No. 5:22-cr-40053-HLT

JEROME C. VETAW,

     Defendant.

---

### MEMORANDUM AND ORDER

The indictment charges Defendant Jerome C. Vetaw with possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Officers responded to Defendant's house after hearing gunshots. A man fleeing the area told officers that he had been at Defendant's house, had been asked to leave, was leaving when he heard the gunshots, and turned around to see Defendant holding a firearm. Officers then met Defendant, entered his home, arrested him, secured the home, obtained a search warrant, and recovered a firearm in the backyard.

Defendant moves to suppress the firearm and seeks relief under *Franks v. Delaware*, 438 U.S. 154 (1978). He argues officers violated his Fourth Amendment rights when they entered his home without a warrant or exigent circumstances. He contends this violation renders the warrant invalid because officers falsely stated the circumstances of the unlawful entry in the supporting affidavit and because the unlawful entry affected the decision to obtain and issue the warrant. The Court denies the motion without reaching the Fourth Amendment issue. The Court finds that the misstatements were not made knowingly or recklessly and finds that the warrant is supported by probable cause even when the challenged misstatements are excised. The Court also finds that the unlawful entry did not affect the decision to get the warrant or to issue the warrant. Officers recovered the firearm independent of the allegedly unlawful entry. The Court denies the motion.

## I.     BACKGROUND[1]

Officer Tyler Wohler with the Topeka Police Department ("TPD") and another TPD officer responded to a call in the 1700 block of Southwest Clay Street before dawn on October 30, 2021. Wohler heard people yelling about a block away and saw a group of about 20 people. Wohler then heard gunfire (four to five shots) from down the street and saw the people disperse. The officers ran to their vehicles and radioed for assistance. Wohler drove south toward where he had heard the gunfire and encountered two men (Eric Johnson and Noah Johnson) running north toward his vehicle. Wohler observed a firearm in Eric's waistband. He ordered Eric and Noah to the ground and detained them. Wohler then questioned Eric.

Eric told Wohler that he and Noah had been at Defendant's house, there had been an argument with Defendant, and he and Noah were leaving the house when he heard the gunshots. Eric told Wohler that he turned and saw Defendant holding a firearm and that he believed Defendant had fired shots into either the air or the ground. Eric also told Wohler that he then pulled his own firearm and racked its slide to chamber a round but did not fire it. A gunshot residue test later came back negative, which was consistent with Eric's denial.

Other officers arrived at Defendant's house while Wohler was talking with Eric. These officers included Sergeant Justin Long and Officer Childers.[2] Defendant emerged from the house and began talking with the Long and Childers. Long testified that Defendant appeared agitated and "worked up" and that Defendant's hand was bleeding. Long testified that he had heard people inside the house talking and was concerned about them. Long asked Defendant about the injury to

---

[1]     The Court held an evidentiary hearing and oral argument on November 7, 2023. The Court received Exhibits 1-4 and received the testimony of Tyler Wohler, Justin Long, William Ackerley, and Hector Montoya. The Court found all four men to be credible witnesses based on their demeanor and attentiveness during questioning. Their testimony was consistent with each other and the body camera video evidence submitted and, at times, they conceded facts not helpful to the government's case.

[2]     Officer Childers's first name was not given.

his hand. Defendant explained that he had injured it on a table inside the house but was fine. Defendant then invited the officers into his house to "check the premises." Long and Childers walked up to Defendant's front door and heard Defendant yell at the people inside to "shut the fuck up."

Long and Childers followed Defendant into the entryway. Long saw multiple people inside, including a woman sweeping up glass. Defendant instructed the people inside to tell the officers that they were okay. Defendant then abruptly told Long and Childers to turn their lights off and "get the fuck away" from him and that he did not want them in his home. Long asked if the other individuals inside were okay, and they said yes. Long testified that he was still concerned but concluded that he did not have knowledge of any specific crime or anyone being in inherent danger at that moment. Long and Childers left the house. Defendant and the other people remained inside.

Long and Childers then received a radio call from Wohler. Wohler told them that Eric told him that Defendant had fired the shots. Wohler advised Long and Childers that Defendant was now a suspect for aggravated assault. Long believed probable cause to arrest Defendant existed after learning this information. Long also intended to conduct a protective sweep and then secure the house while getting a warrant to search Defendant's home. Long and Childers walked back to Defendant's door.

One of the house's other occupants opened Defendant's door after Long knocked. Long then placed his foot inside Defendant's door and asked Defendant to come outside to talk. Long wanted Defendant outside where it was more controlled. The house's other occupants concerned Long. Long also believed that there was a firearm inside. Defendant stood just inside the threshold, refused to exit the house, and told the officers several times that they would need to "get a warrant." Defendant also demanded that Long remove his foot and shut the door.

3

Long then stepped across the threshold into the house and arrested Defendant. Defendant was removed from the house and taken away from the scene. Officers then did a protective sweep to clear the house of occupants and ensure it was secure. Officers located several other occupants, including one who was hiding in a bedroom. Officer Hector Montoya participated in the sweep and testified that these individuals were patted down and then removed from the house. Officers did not search for, nor did they find, a firearm during the sweep. Long testified that the officers conducting the sweep were looking for people not evidence. Officers remained on the scene after finishing the sweep to ensure it was not disrupted while they waited for a search warrant to issue.

Detective Bill Ackerley was responsible for applying for the search warrant and talked to some of the officers from the scene. Ackerley prepared an application for a warrant to search Defendant's house for firearms, firearm accessories, ammunition, identifying documents, and a barbeque poker stick. Ackerley stated in the warrant application's supporting affidavit that Defendant had been intoxicated when he encountered the officers at his house and that he had refused to speak with them. Ackerley also stated that nobody else had been inside Defendant's house when the officers entered and conducted the sweep. A Shawnee County district court judge issued the warrant shortly after 9:00 a.m. Officers executed the warrant and recovered a pink 9mm firearm in Defendant's backyard.

A grand jury later returned an indictment charging Defendant with possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g)(1). He now moves to suppress the firearm.

## II.    ANALYSIS

Defendant moves to suppress the evidence obtained in violation of his Fourth Amendment rights. He also seeks relief under *Franks v. Delaware* because the affidavit supporting the search

warrant contained misstatements.[3] Defendant contends that the officers violated his Fourth Amendment rights when they entered his house without a warrant or exigent circumstances. Defendant argues that this violation renders the warrant invalid because officers falsely stated the circumstances of the unlawful entry in the supporting affidavit and because the unlawful entry affected the decision to obtain and to issue the warrant.

The Court denies Defendant's motion. The Court declines to address whether the officers violated Defendant's Fourth Amendment rights because the motion fails even assuming they did. *See United States v. Agent*, 765 F. App'x. 891, 893-95 (4th Cir. 2019) (declining to reach Fourth Amendment issue because independent source doctrine resolved motion). First, the Court finds that Ackerley did not knowingly or recklessly include the misstatements and (alternatively) the warrant is supported by probable cause even when the challenged misstatements are excised from it. Second, the Court finds that the unlawful entry did not affect the decision to get the warrant or to issue the warrant. Officers recovered the firearm independent of the allegedly unlawful entry; there is no nexus between the entry and the firearm's recovery. *Segura v. United States*, 468 U.S. 796, 813-814 (1984); *see Murray v. United States*, 487 U.S. 533, 536-539 (1988) (discussing independent source).

**Misstatements in the Warrant Application.** The Court starts with Defendant's argument that the warrant was invalid because its supporting affidavit misstated certain facts. Defendant points to two statements: (1) "Officers said that [Defendant] was intoxicated and he refused to

---

[3]    Defendant's motion seeks a hearing pursuant to *Franks v. Delaware* in connection with the misstatements in the warrant affidavit. The government argues Defendant has failed to make the initial showing necessary to entitle him to such a hearing. During the evidentiary hearing in this matter, the Court heard evidence on the *Franks* issue Defendant raised. The Court thus addresses the merits of Defendant's challenge to the warrant under *Franks*. *See United States v. Chaney*, 2022 WL 745202, at *4-8 (D. Kan. 2022), *aff'd*, 2023 WL 4196762 (10th Cir. 2023).

speak with officers," and (2) "Officers then conducted a security sweep of [Defendant's house] to make sure no one else was inside the house and no one else was inside." Doc. 42-1 at 2.

The Court agrees that these two statements are inaccurate and misstated. Long testified that Defendant was agitated and worked up. The Court agrees with this assessment after viewing Officer Childers's AXON body camera video, which was submitted as the government's Exhibit 4 during the evidentiary hearing. The Court finds that this video shows Defendant was volatile, agitated, and excited. But there is no firm evidence that he was intoxicated. For example, Defendant never said he was intoxicated or had recently consumed any alcohol or drugs. Defendant initially spoke with officers and invited them into his home, but he then ordered them out of his house and refused to speak with them when they reapproached his home. Defendant ultimately refused to speak to the officers, but he did initially speak with them. Similarly, officers conducted a security sweep of his house and found several other people in it. They patted these individuals down and had them leave the house.

But the warrant is not invalid just because these statements are false. The statements must have been made deliberately or recklessly <u>and</u> be necessary to support probable cause. *Franks*, 438 U.S. at 155-56; *United States v. Chaney*, 2023 WL 4196762, at *2 (10th Cir. 2023) (explaining standard).

The Court initially finds that Ackerley did not knowingly or recklessly include false statements in the affidavit. Ackerley testified at the hearing about the circumstances of drafting the affidavit. He explained that the detective drafting an affidavit is unable to talk with every involved officer because some of the officers were already working other calls, so the officers try to consolidate the information for the detective. Ackerley spoke with Wohler, Childers, and Detective

Fredericks.[4] He did not recall whether he spoke to Long. Wohler told Ackerley about his conversation with Eric. Ackerley also learned about the negative gunshot residue test from Detective Fredericks.

Ackerley discussed the statement about Defendant not speaking with officers during the November 2023 hearing. Ackerley explained that he had wanted to interview Defendant but did not. He had understood that Defendant was intoxicated and refused to speak with officers but did not document or recall who told him that information. Ackerley testified that he included this statement to let the judge know why Defendant had not been interviewed. And months later he watched officers' AXON body camera videos and learned contrary information. Ackerley also discussed the security sweep statement. He explained that he misunderstood who had been present in the house but knew officers had secured Defendant and secured the house.

The Court finds that Ackerley did not knowingly or recklessly include false statements. The Court observed Ackerley's testimony and found him to be honest and credible. He was working under difficult circumstances and was trying to correctly synthesize information from various officers. He conceded his mistakes and took responsibility for them. And it seems highly unlikely that an experienced officer (Ackerley had worked for TPD for nearly 14 years) would risk his reputation to falsify this type of information in an affidavit.

Regardless (and alternatively), the Court finds that the misstatements were not necessary to support probable cause. At best they were of marginal importance to the overall affidavit, and probable cause still exists on the affidavit's face when the misstatements are excised. The affidavit states that officers were in the area when they saw and heard a disturbance, heard gunshots, and saw people disperse. Officers took Eric and Noah into custody. Eric was in possession of a firearm.

---

[4]    Detective Fredericks's first name was not given.

Eric told officers that he had been at Defendant's house, Defendant got upset with him and told him to leave, he went outside and started to leave, he then heard gunshots, and he turned around to see Defendant with a gun in his right hand. Eric told officers that he believed Defendant either shot the gun into the ground or into the air and that he feared for his life. Eric saw police arriving and began running down the street. He consented to a gunshot residue test, which was negative. Officers arrived and saw Defendant go into his house. The affidavit outlines Defendant's prior convictions. The affidavit seeks to search Defendant's house for "[f]irearms, firearm accessories, ammunition, identifying documents, [and a] barbeque poker stick." And it concludes with a request for "a warrant authorizing the search of the aforementioned property which items are contraband or are fruits, instrumentalities or evidence of: Aggravated Assault, Felon in Possession of a Firearm."

These facts are enough for a "prudent person to believe there [was] a fair probability that contraband or evidence of a crime" would have been found at Defendant's house. *Chaney*, 2023 4196762, at *2. The warrant affidavit thus supports a finding a probable cause even after excising the misstatements.

In sum, the Court finds that Ackerley did not include knowing or reckless misstatements in the affidavit but, even if he had, the affidavit still supports a finding of probable cause with the problematic statements excised.

**Nexus.** The Court finds that the warrant was not invalid because of misstatements in the affidavit. But this doesn't resolve the motion because the allegedly unlawful entry could have affected the decision to obtain or to issue the warrant. The Court therefore analyzes whether there is a nexus between the allegedly unconstitutional entry into Defendant's home and the recovery of the firearm during execution of the search warrant. This nexus is necessary because courts do not

suppress evidence as fruit of the poisonous tree "unless the illegality is <u>at least</u> the 'but for' cause of the discovery of the evidence." *Segura*, 468 U.S. at 815 (emphasis added). Stated differently, the firearm's discovery is independent of the allegedly unlawful entry unless there is a but-for connection (or nexus) between the two.[5] *Id.* at 814-15.

The Court finds that this nexus is missing. First, the Court finds that the decision to obtain the warrant was not affected by anything the officers gleaned when they reentered Defendant's house. *Murray*, 487 U.S. at 542. Long had already decided to obtain a warrant before he reapproached the home. Long testified that he initially left the house when Defendant demanded he leave because he did not think he had probable cause. Wohler then told Long and Childers that Defendant was suspected of firing the shots and that officers had charges and a victim for aggravated assault. Long testified that at this point there was probable cause to arrest Defendant and a need to try and secure all the evidence while waiting for a search warrant. He and Childers then reapproached, entered, arrested Defendant, swept the house, and secured it. Long even explained that he kept his foot in the door before reentering and arresting Defendant to facilitate the officers' efforts to secure the house while waiting for the search warrant. The allegedly illegal entry thus did not affect the decision to get a warrant. *Id.*

Second, the Court finds that the decision to issue the warrant was not affected by the allegedly unlawful entry. The application did not present any "information obtained during th[e] entry" that would have "affected [the judge's] decision to issue the warrant." *Murray*, 487 U.S. at 542. The Court explained above that the warrant affidavit still supported a finding of probable cause when the misstatements are excised. And none of the facts identified by the Court as

---

[5]    The Court notes for clarity that it's employing the independent source concept in the "general" rather than "specific" sense. When used in the "general sense" the concept encompasses "all evidence acquired in a fashion untainted by the [allegedly] illegal evidence-gathering activity." *Murray*, 487 U.S. at 537-38.

supporting a finding of probable cause were gleaned from the reentry and sweep.[6] The allegedly unlawful entry thus did not affect the decision to issue the warrant. *Agent*, 765 F. App'x. at 894.

In sum, the firearm's discovery did not depend on the officers' allegedly unlawful conduct. *Murray*, 487 U.S. 542-43; *Segura*, 468 U.S. at 814-15. Long had already made the decision to get a warrant before reapproaching and entering the house. Officers did not see the firearm in the house. Officers did not recover the firearm from Defendant or any of the other occupants. And none of the occupants told the officers anything about the firearm. The officer obtained the warrant and recovered the firearm from Defendant's backyard. In essence, "[h]ad police never entered [Defendant's house], but instead conducted a perimeter stakeout to prevent anyone from entering . . . and destroying evidence, the contraband now challenged would have been discovered and seized precisely as it was here." *Segura*, 468 U.S. at 814.

The warrant is valid. The recovery of the firearm was independent of officers' allegedly illegal entry. Suppression is thus not warranted. The Court denies the motion.

THE COURT THEREFORE ORDERS that Defendant's motion is denied.

IT IS SO ORDERED.

Dated: December 5, 2023                    /s/ *Holly L. Teeter*
                                           HOLLY L. TEETER
                                           UNITED STATES DISTRICT JUDGE

---

[6]    The only fact learned later is that Defendant had prior felony convictions, but this information is immaterial to the aggravated assault charge.